2011 UT App 340

Jeffrey S. RECORD and Emilie A. Tanner, Petitioners,

v.

WORKFORCE APPEALS BOARD, DEPARTMENT OF WORKFORCE SERVICES; and Zions First National Bank, Respondents.

No. 20100719–CA.

Court of Appeals of Utah.

Oct. 6, 2011.

April L. Hollingsworth, Salt Lake City, for Petitioners.

Suzan Pixton, Salt Lake City, for Respondents.

Before Judges McHUGH, VOROS, and ROTH.

## OPINION

McHUGH, Associate Presiding Judge:

¶1 Jeffery S. Record and Emilie A. Tanner (collectively, Claimants) each filed a separate petition for review challenging the Workforce Appeals Board (Board) of the Utah Department of Workforce Services' (Department) decision to deny them unemployment insurance benefits. Because the Claimants were discharged based on the same conduct and raised identical issues before the Board and on appeal, this court consolidated the two petitions at the request of the parties. We deny the Claimants' petitions.

## BACKGROUND

¶2 The Claimants were each long-term employees of Zions Bank (Employer). After the Employer received reports that the Claimants spent too much time together behind closed doors and otherwise acted inappropriately toward one another during business hours,[1] it decided to speak with them.

1. The Employer received an anonymous complaint through a "hot line" subscribed to by the Employer, stating that the Claimants were engaged in a relationship that is "too personal for a

The Vice President of Human Resources (HR VP) testified that she spoke with Ms. Tanner on approximately September 23, 2009, about the complaints. The HR VP indicated that she directed Ms. Tanner to "manag[e] the perception" that the Claimants were engaged in an inappropriate relationship and specifically instructed Ms. Tanner "to make sure that your actions in the workplace are appropriate and that you keep some professional distance" from Mr. Record. When Ms. Tanner "denied [that] the relationship was inappropriate," the HR VP advised her "to just stay away from [Mr. Record]."

¶ 3 On that same day, the HR VP met with Mr. Record for about ninety minutes to discuss his relationship with Ms. Tanner. The HR VP advised Mr. Record "that if [Ms. Tanner] was to come see [him] not to do it behind closed doors, because there [were] complaints that [the two of them] were behind closed doors for a long period of time.... And then [they] talked about just managing the perception of keeping a professional distance." The HR VP did not place Mr. Record or Ms. Tanner on probation.

¶ 4 According to Ms. Tanner, the HR VP indicated that the September meeting was "just a formality; that she had to do it; [and] that the case was closed." In addition, Ms. Tanner claimed that she did not spend inordinate amounts of time with Mr. Record in his office or otherwise act inappropriately during business hours. Mr. Record also denied that his behavior toward Ms. Tanner was inappropriate and testified that the HR VP told him the meeting in September of 2009 was just a formality.

¶ 5 The HR VP testified that, despite these discussions, the Employer received reports that the Claimants "continued to meet behind closed doors." Consequently, the Employer made further attempts to rectify the problem. The Executive Vice President for Retail Credit (EX VP) testified that Ms. Tanner's supervisor attempted counseling with Ms. Tanner about her relationship with Mr. Record. The HR VP was also aware that Ms. Tanner's supervisor "had several conversations with [Ms. Tanner] and coached her about ... staying away from [Mr. Record]." Although Mr. Record testified that he lost his office due to administrative changes, the HR VP indicated that the Employer moved Mr. Record from his office into a workspace in a common area, relocated Ms. Tanner, and "did some other things to try to manage" the problem created by the Claimants' conduct. Notwithstanding these changes, the "acting manager at the time came [to the HR VP] and had some concerns that [the Claimants] were still spending a lot of time together."

¶ 6 The HR VP prepared a written report on November 10, 2009, indicating that "both employees have not made necessary changes in their working relationship and appear to dismiss our directives." In a note to Ms. Tanner's employee file, her immediate supervisor indicated that he had spoken with her that same day—November 10, 2009—about the renewed concerns. In particular, the note states that the supervisor reminded Ms. Tanner that the Employer's expectation was that she was "not [to be] in [Mr. Record's] office at all," that her "conversations with [Mr. Record] were to be work related only," and that she was "not to leave [the] department with [Mr. Record]." The note concludes, "I indicated that since this had been previously reviewed[,] if it occurred again, [Ms. Tanner] could be terminated."

¶ 7 A note from Mr. Record's supervisor (Supervisor) indicates that on November 13, 2009, Supervisor and another manager (Manager) met with Mr. Record concerning his continued involvement with Ms. Tanner. According to the note, Mr. Record "was embarrassed and very surprised that [they] were meeting with him because he [felt] that he [had] done everything requested of him ... concerning his interaction with [Ms. Tanner]." At that time, Mr. Record explained that there were business reasons for him and Ms. Tanner to communicate. The Supervisor reported that Mr. Record "apologizes if anyone thought that he was disregarding the counsel that he received. He is committed to

work environment," "unprofessional," and that "affects coworkers." In addition, two or three employees complained directly to the Vice Presi-

dent of Human Resources. One employee indicated that "he had witnessed an inappropriate action in ... the parking lot in a vehicle."

following that counsel, keeping his head down and getting his work done." Although the Supervisor expressed concern about the Employer checking the facts, "in case the anonymous complainer has an agenda," he and the Manager "encouraged [Mr. Record] to stay focused on his work and to stay away from other individuals['] personal lives while at work."

¶ 8 The HR VP testified that she also met with Mr. Record in November of 2009. According to the HR VP, Mr. Record claimed that he had "done everything that [she had] asked [him] to do [and had] . . . stayed away from [Ms. Tanner]." The HR VP did not believe Mr. Record "because people ha[d] continued to complain about them being together." Mr. Record denies that the HR VP spoke to him at that time. However, the EX VP testified that his office is located next to the HR VP's office and that he saw Mr. Record in the HR VP's office for formal counseling on more than one occasion.

¶ 9 The HR VP testified that she also had a follow-up meeting with Ms. Tanner in November of 2009 to discuss the continuing concerns about her unprofessional relationship with Mr. Record. Ms. Tanner denies that she met with the HR VP or with her supervisor in November. Instead, Ms. Tanner testified that the only time anyone spoke with her about her relationship with Mr. Record was when the HR VP told her to manage the perceptions of other employees in September of 2009.

¶ 10 Both Claimants assert that they complied with the instructions they received in September of 2009 from the HR VP and were managing the perceptions of other employees by avoiding contact with one another during office hours. Although they had previously met for an "occasional breakfast together in an open cafeteria where other people dined," and had "conversations in and around their business," they "chose not to talk, not [to] eat breakfast, and not [to] do the things that other people do, in an effort to try to keep the perceptions under control." Sometime in February of 2010, the Employer demoted Ms. Tanner. According to Mr. Record, it was about this same time that he learned he would not be given an office to replace the one that had been reassigned during the administrative reorganization.

¶ 11 On February 19, 2010, a coworker of the Claimants was suffering from a head cold that required her to blow her nose frequently. Rather than disturb the employees in close proximity to her working space, the coworker went to an unused file room to blow her nose. Although the door to the file room was open, the room was dark with only the security lights at the back of the room illuminated.[2] The file room was a large, unused space that contained shelves. The coworker testified that when she entered the file room, she heard a rustling noise and turned on the lights to see what it was. When the lights came on, the coworker stated that she saw the Claimants in the far back corner of the room and noticed that Ms. Tanner was sitting on Mr. Record's lap on a red chair.[3] According to the coworker's written report of the incident, she saw the Claimants with their "clothes half off in the back corner of the room on a chair." The coworker reported that when the lights came on, Ms. Tanner "jumped up. And Mr. Record's pants were not on, so he jumped up and pulled his pants up." The coworker indicated that she was shaken up by what she had observed and quickly left the file room. However, she remained in the hallway to make sure that she had properly identified the two people as the Claimants. The coworker testified that Mr. Record left the file room first and went immediately into another employee's office on that same floor. Then, the coworker observed Ms. Tanner leave the

---

**2.** There is some discrepancy in the record regarding whether there was one security light or whether there were multiple lights. The HR VP testified that there was a security "light." The coworker, the EX VP, Mr. Record, and Ms. Tanner indicated that there were security "lights."

There is also some discrepancy regarding the location of the lights. The HR VP indicated that the light was close to the entrance of the file

room. The coworker indicated the lights were at the back of the room. The EX VP indicated there were lights both at the entrance of the file room and near the back.

**3.** The coworker indicated that Mr. Record might have actually been sitting on a cart that was next to the chair.

room and go up the stairs. Although the Claimants both worked on the second floor of the building, the file room was located on the first floor.

¶ 12 At the hearings before the Administrative Law Judges (ALJs), the Claimants tried to establish that the coworker's view would have been blocked by the shelves in the room and their contents. However, the coworker was adamant that she was able to see the Claimants and see what they were doing. The EX VP and the HR VP each testified that, after they learned of the incident, they had each visited the file room to assess the conditions under which the coworker had observed the Claimants. Both the EX VP and the HR VP reported that, with the lights on, they were able to see the corner where the coworker reported she had observed the Claimants from the doorway.

¶ 13 The Claimants deny that they were in a state of undress in the file room. They testified that they met to discuss work-related issues in the file room as an attempt to "keep things subtle" and to "manage perceptions." Mr. Record stated that they had no "romantic involvement," and Ms. Tanner testified that they were just "real close friends." According to Mr. Record, "the reason [they] didn't have the big lights on was because if [they] were trying to be in a low profile environment obviously putting on the big lights didn't help us stay low profile." In hindsight, Mr. Record recognized that "[o]bviously it was a lapse of judgment" and agreed that it looked bad.

¶ 14 The coworker reported the incident to her manager, who then informed the EX VP. The EX VP testified that he called Ms. Tanner into his office and asked her, "[D]o you feel that being in a dark room with a coworker is inappropriate behavior?" to which she responded, "Yes, it is inappropriate behavior." According to the EX VP, Mr. Record gave the same response to that question when the EX VP met with him about the incident. Although the Claimants admitted to being in the file room together, they alleged that they were engaged in a work-related discussion. According to Ms. Tanner, she routinely took her breaks in the file room. Further, although Ms. Tanner admits

that the EX VP asked her "if it was appropriate for a married man to be in a dark room with an unmarried female?," she claims she replied, "I guess it depends on the situation." The Employer discharged both Claimants on February 22, 2010, for gross misconduct and the creation of a hostile work environment.

¶ 15 Each Claimant filed for unemployment benefits, which were denied based on the Employer's representation that the Claimants were terminated for just cause. The Claimants participated in separate unemployment hearings before different ALJs. During the hearings, the Claimants asserted that the coworker's view of the corner of the file room where they were discovered was obstructed by the shelving and boxes in the file room. According to the Claimants, the coworker could not have seen what she reported. The ALJs at each hearing found the Employer's witnesses more credible than the Claimants and determined that the Employer acted with just cause in terminating the Claimants' employment and that, therefore, the Claimants were not entitled to unemployment benefits.

¶ 16 The Claimants each appealed the ALJs' decisions to the Board. During the appeals, the Claimants attempted to introduce new evidence in the form of photographs taken from the entrance to the file room. The Claimants argued that this photographic evidence established that the coworker could not have seen the Claimants in the back corner of the room from the doorway. The Board denied the request to supplement the administrative record with the photographs. Then, in each administrative appeal, the Board affirmed the decisions of the ALJs that the Claimants had been discharged for just cause. Therefore, the Board also affirmed the ALJs' conclusions that neither Claimant was entitled to unemployment benefits.

¶ 17 The Claimants each filed a petition for review of the Board's decisions with this court. *See* Utah Code Ann. § 35A–4–508(8)(a) (2005) (providing that any aggrieved party may seek review of a decision of the Board by filing a petition with the Utah Court of Appeals); Utah Code Ann. § 78A–

4–103(2)(a) (Supp.2011)[4] (providing the Utah Court of Appeals with subject matter jurisdiction over final agency proceedings); Utah Code Ann. § 63G–4–403 (2008) (providing for judicial review of formal administrative proceedings). At the request of the Claimants, who are represented by the same counsel, we have consolidated the petitions for decision.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 18 The Claimants contend that the Board erred in not allowing or considering the photographs as a supplement to the administrative records. We afford the Board some deference in the application of its administrative rules. *See Ekshteyn v. Department of Workforce Servs.*, 2002 UT App 74, ¶ 5, 45 P.3d 173 ("[B]ecause proper application of the Employment Security Act and the relevant rules requires little highly specialized knowledge that would be uniquely within the [Board's] expertise ... this court will review the agency's decision with only moderate deference." (alterations in original) (internal quotation marks omitted)).

■ ¶ 19 Based on that photographic evidence, the Claimants also assert that the decisions of the ALJs should be reversed and that the matter should be remanded for a new hearing. An employee is not eligible for unemployment benefits if the employee has been terminated for just cause. *See* Utah Code Ann. § 35A–4–405(2)(a). The question of whether the Employer had just cause to terminate the Claimants is a mixed question of law and fact upon which the employer has the burden of proof. *See Smith v. Workforce Appeals Bd.*, 2011 UT App 68, ¶ 11, 252 P.3d 372; *Johnson v. Department of Emp't Sec.*, 782 P.2d 965, 968 (Utah Ct.App.1989). We will disturb the Board's findings of fact only if, when viewed in light of the record as a whole, they are not supported by substantial evidence. *See* Utah Code Ann. § 63G–4–403(4)(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 8, 157 P.3d 334

(internal quotation marks omitted). When we review the Board's application of the law to its findings of fact, "we will uphold the [Board's] decision so long as it is within the realm of reasonableness and rationality." *Id.* ¶ 9 (alteration in original) (internal quotation marks omitted).

## ANALYSIS

¶ 20 The Claimants first contend that the Board erred by denying their request to supplement the record after the hearing before the ALJs with the photographs of the file room. "Absent a showing of unusual or extraordinary circumstances, the Board will not consider new evidence on appeal if the evidence was reasonably available and accessible at the time of the hearing before the ALJ." Utah Admin. Code R994–508–305(2). The Claimants assert that the Board should have accepted the photographs because they were not reasonably available at the time of the hearing and because the Claimants could not have foreseen the need for the photographic evidence at the time of the hearing. The Board disagreed with both arguments.

■ ¶ 21 Before this court, the Claimants contend that the evidence did not exist at the time of the hearing because they had not yet taken the pictures. We are not convinced. Although the Claimants had not yet recorded the evidence by snapping photographs of it, the physical conditions of the file room, including the degree to which the shelves and their contents obstruct the view of the corner where the Claimants were discovered, were in existence on the date of the incident and remained in existence throughout the hearings before the ALJs. Although the Claimants argue that the Employer would not have permitted them to take pictures of the room, they offer no evidence to support that contention. There is nothing in the record that reflects any attempt by the Claimants to obtain permission from the Employer to photograph the file room prior to the hearing before the ALJs. The Board notes that the ALJs could have instructed the Employer to

---

**4.** Because the material provisions of the statute have not changed, we cite to the current version for the convenience of our readers.

give the Claimants access to the room for that purpose. Consequently, we agree with the Board that the evidence was "reasonably available and accessible at the time of the hearing." *See* Utah Admin. Code R994–508–305.

¶ 22 The Claimants also argue that there were extraordinary circumstances that support admission of the photographs after the hearings. *See id.* In particular, the Claimants assert that they could not have anticipated the need for the evidence because they were unaware that other witnesses would corroborate the coworker's testimony that one could see the corner where the Claimants were discovered from the door. In response, the Board reasoned that the Claimants each received information prior to the hearings before the ALJs advising them of the need to present all relevant evidence at those hearings and that further review would be limited to the evidence presented to the ALJs. At the beginning of the Tanner hearing, the ALJ stated, "The testimony and evidence presented in today's hearing will serve as the case record reviewed on any further appeal. Due to this, it's very important that all testimony and evidence concerning the case is presented at today's hearing." In addition, the hearing transcript reflects that "prior to the hearing, both parties were mailed a copy of evidentiary exhibits." Among the exhibits the division of adjudication sent to the Claimants, were exhibits eight and twelve, both of which include the coworker's statement that, from her vantage point at the entrance, she observed the Claimants in the far corner of the file room. Indeed, the exhibits provide notice that the coworker claimed that, once she turned on the lights, she could see well enough to identify the Claimants and to ascertain that they were partially undressed. The Claimants also were aware that the coworker's report of what she observed in the file room was the basis of the Employer's decision to discharge them, as well as the ALJs' decisions to deny them unemployment benefits. Whether or not other employees testified that it was possible to see into the corner where the Claimants were discovered, or whether the Employer had the burden of proof at the hearing, the alleged inability of the coworker to see through the shelves and their contents was a critical part of the Claimants' cases. Therefore, we cannot say that the Board has misapplied its rule regarding supplemental evidence by concluding that the testimony from the other witnesses did not create extraordinary circumstances that justified the posthearing admission of the photographs.[5]

¶ 23 The Board further indicated that, even if it had considered the photographs, it was not apparent that they would have affected its decision, stating, "It seems as though the area where [the Claimants] were is visible from where [the coworker] said she was standing by merely looking through the shelves." The Claimants filed motions for rehearing in which they explained that when the photographs were taken, Mr. Record was "sitting where he was sitting" when the Claimants were discovered. Because Mr. Record was not visible in the photographs, the Claimants argued that the photographs proved that the coworker was lying about what she saw. After considering the Claimants' further explanation, the Board reaffirmed its decision not to accept the photographs. The Board explained that the coworker testified that she could see the Claimants by looking through the shelving and that Ms. Tanner testified that she could see the coworker from her position in the corner. Therefore, the Board was not persuaded that the photographs offered by the Claimants impeached the coworker's claim that she observed the Claimants as described.

¶ 24 We are not convinced that the Board misapplied its rule in refusing to accept the photographs as evidence on this basis. The fact that a person cannot be seen in a photograph taken from a fixed point behind the shelves does not disprove the testimony of the coworker or the other witnesses. The

---

5. In addition, Mr. Record's administrative hearing took place on April 13, 2010, but Ms. Tanner's was not held until May 4, 2010. Both Claimants testified at each hearing. Thus, Ms. Tanner knew prior to her administrative hearing that the EX VP and HR VP would corroborate the coworker's testimony that it was possible to see the corner where the Claimants were discovered through the shelves from the entrance to the file room.

HR VP visited the room after the event and described it as "a large enough room, but there's just a security light that's on the right perimeter, so it's not fully lit." Although she acknowledged that "it'd be difficult to [see] where the two were supposed to have been seen" with the lights off, "when you turn the lights on, you have full view right to the back corner." The EX VP agreed with that assessment. He explained that he went to the exact spot where the coworker claimed to have been standing and that, with the lights off, he could not see a third person whom he had asked to stand where the Claimants were discovered. However, the EX VP testified that when he turned on the lights he "could see just about all parts [of the other person] between the shelving because the shelving is empty." Indeed, Ms. Tanner admitted that she could see the coworker at the door from her position in the corner. In fact, while Ms. Tanner was ultimately wrong about who turned on the light, she testified that she could discern that the person was female, and that she could see the person's face. When asked how she knew if the person was male or female, Ms. Tanner answered simply, "I could see the person." While the Claimants argue that her ability to do so is akin to someone peering through a peephole, that theory is not consistent with the description of the room in the record. Finally, despite both Claimants' attempts at cross-examination, the coworker was unequivocal that she could see the Claimants through the shelves. Mr. Record asked the coworker whether her vision was occluded due to "some boxes on some of the shelves," the "relatively long distance" from the door to the corner, the fact that the coworker was "looking to see something that's down below," or because her line of sight was "crossing a number of shelves." The coworker stated, "Well you can still see right through them. You can still see. I mean of course there are blank spots where you can't but. . . ." Upon further

questioning, the coworker did not retreat from her position that she was able to see the Claimants, notwithstanding the shelves and their contents. The following dialogue took place:

> Mr. Record: What was between you and me?
>
> Coworker: Shelves.
>
> Mr. Record: Was there anything blocking your view?
>
> Coworker: Not blocking my view because I can see straight through.

We agree with the Board that there is nothing about the photographs that proves that the coworker was not telling the truth.

¶ 25 Ultimately, the decision whether to consider evidence not presented at the hearing before the ALJs is a question of fairness. "Elementary fairness in unemployment compensation adjudications includes a party's right to see adverse evidence and be afforded an opportunity to rebut such evidence." *Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 70 (Utah Ct.App.1989). The Board recognized this concern, stating that "[t]he problem with providing the photographs at this stage is that the Employer's witnesses are not available at this point to evaluate the photographs and state whether the photos accurately represent the room at the time of the incident." Moreover, when the coworker testified that she saw the Claimants half-dressed in the file room, the Claimants had an opportunity to cross-examine her about the shelving blocking her view using detailed diagrams of the room. Under these circumstances, we are convinced that the decision not to accept photographs taken from a fixed point after the hearing comports with elementary fairness. *See EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 13, 157 P.3d 334 (holding that evidence excluded by the ALJ was not critical because the ALJ allowed extensive questioning about the contested expenditures reflected in the documents).[6]

---

6. Mr. Record also contends that the ALJ discouraged him from introducing testimony from a witness who was present during the February 19, 2010 meeting between Mr. Record and the EX VP. However, it is not clear from the record that this witness would have contradicted the EX VP's account of the meeting. According to Mr. Record, this witness would have testified that the Claimants had work-related reasons for meeting with one another and that Mr. Record's personal telephone calls were not improper. However, neither the ALJ's decision, nor the Board's deci-

¶ 26 Finally, the Claimants contend that the Board's decision that they are not entitled to unemployment benefits should be reversed. Employees are ineligible for unemployment benefits if they were discharged for just cause. *See* Utah Admin. Code R994–405–201. To establish that an employee was discharged for just cause, the employer must show (1) culpability, (2) knowledge, and (3) control on the part of the employee. *See id.* R994–405–202; *id.* R994–405–203; *see also Smith v. Workforce Appeals Bd.*, 2011 UT App 68, ¶ 11, 252 P.3d 372. The only basis upon which the Claimants challenge the Board's conclusion that each of these requirements was met, is their attack on the credibility of the coworker. According to the Claimants, the photographs prove that the coworker was not telling the truth. As discussed, the photographs simply provided corroborative evidence of the Claimants' own testimony and argument that the coworker's view was blocked by the shelves in the file room. Furthermore, the record does not support the Claimants' argument that the coworker stared fixedly, without adjusting her line of sight in any manner, from a set position that would have been blocked by the shelves and their contents. While the coworker could not remember that she bent her knees in order to see, or identify the levels of the shelves between which she looked, she testified that there were "a few different levels that [she could] see" through from her vantage point by the door. The coworker further indicated that the boxes in the file room were not "stacked up on the filing cabinets,"[7] but were located "on the floor," leaving the shelves "empty." Looking through the gaps between the shelves, the coworker stated that "I could see their faces and the filing cabinet. It's a filing room, so there's parts that are blocked. But I saw legs and I saw faces." Contrary to the Claimant's position, the photographs do not definitively prove that the coworker was untruthful. Furthermore, "[i]t is not [this court's] duty to resolve these conflicts; rather, it is the province of the ALJ to determine which party is more credible where divergent testimony is given." *EAGALA*, 2007 UT App 43, ¶ 19, 157 P.3d 334 (citation omitted).

¶ 27 Considering the record as a whole, there is evidence that "a reasonable mind might accept as adequate to support a conclusion" that the Employer had just cause to discharge the Claimants. *See id.* ¶ 8 (internal quotation marks omitted). In light of this substantial evidence, we will not disturb the Board's adoption of the ALJs' findings of fact. *See* Utah Code Ann. § 63G–4–403(4)(g) (2008). Furthermore, the Board's application of the law to those facts is "within the realm of reasonableness and rationality." *EAGALA*, 2007 UT App 43, ¶ 9, 157 P.3d 334 (internal quotation marks omitted). The Board accepted the ALJs' findings that the coworker had accurately reported that the Claimants were in a state of undress in the file room. Even Mr. Record agrees that "if in fact [he] were naked in the room, as claimed by [the coworker], [he] should have been terminated."

## CONCLUSION

¶ 28 The photographs were reasonably available and accessible to the Claimants prior to the hearings before the ALJs, and no extraordinary circumstances required the Board to consider them after those hearings. Based on the whole record, there is substantial evidence to support the Board's findings of fact, and its decisions that the Claimants were discharged for just cause is within the bounds of reasonableness and rationality. Consequently, we do not disturb the Board's

---

sion, was based on either of these issues. Instead, it was based on the coworker's report of what she observed in the file room, combined with the prior instructions to the Claimants to manage the perception of other employees that they were engaged in an inappropriate relationship. Furthermore, whether or not there were business issues the Claimants could legitimately discuss, the witnesses could not explain why doing so in the far corner of a dark room on a different floor from their offices was essential to their work. As the EX VP explained, the problem was Mr. Record "being in a dark file room with [Ms.] Tanner after a number of people in [the] department had disclosed to [him] that that's inappropriate behavior and [he] shouldn't do it."

7. The coworker refers to the shelves in the file room as filing cabinets.

decision denying unemployment benefits to the Claimants.

¶ 29 WE CONCUR: J. FREDERIC VOROS JR. and STEPHEN L. ROTH, Judges.