IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| David D. Adams, | ) | OPINION |
| | ) | |
| Petitioner, | ) | Case No. 20110406-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Department of Workforce Services, | ) | (August 16, 2012) |
| Workforce Appeals Board, | ) | |
| | ) | 2012 UT App 226 |
| Respondent. | ) | |

-----

Original Proceeding in this Court

Attorneys:     Joseph E. Hatch, Murray, for Petitioner
               Amanda B. McPeck, Salt Lake City, for Respondent

-----

Before Judges McHugh, Davis, and Christiansen.

McHUGH, Presiding Judge:

¶1      David D. Adams petitions this court to review a decision of the Workforce Appeals Board (the Board) that determined he was ineligible to receive unemployment benefits, assessed an overpayment penalty, and treated his motion to reopen the evidentiary hearing as an appeal to the Board. We decline to disturb the Board's decision.

BACKGROUND

¶2      Adams was employed as the chief technology officer at an early stage technology company until he was laid off in April 2009.  He filed claims for unemployment insurance benefits beginning on April 26, 2009, and received weekly benefits until October 16, 2010.  When Adams first started receiving benefits, the Department of Workforce Services (the Department) sent him the *Claimant Guide: Unemployment Insurance Benefits* (the *Claimant Guide*), which provided instructions regarding a claimant's responsibility to conduct a job search while receiving unemployment benefits.  It states,

> **Work Search Requirements**
>
> Your obligation while receiving unemployment benefits is to become reemployed, and you should develop a realistic plan to achieve this objective.  A primary component of your re-employment plan will be to contact employers.  Unless a Department representative instructs otherwise, you are required to make a good faith effort to seek full-time work each week that you claim benefits, even if you are employed part time.
>
> Additional job-development activities that will enhance your prospects of finding work include:  writing resumes, visiting employers' web sites, networking, contacting private or church employment agencies or visiting a DWS Employment Center.  The phrase "good faith effort to seek work" means that you will consistently make the types of personal efforts to find work that are customary for persons in the same or similar occupations.  Your efforts must reflect a genuine desire to obtain employment immediately.
>
> **You should make at least two contacts each week with employers not previously contacted.**  If you do not make at least two new contacts during a given week, you may be denied benefits; however, the Department will evaluate your

overall work-search efforts during the week before making an eligibility determination.

You are required to keep a detailed record of your work search activities. You may be selected at any time for an audit or eligibility review during which you will be asked to provide this information. Your record of employer contacts should include the following: (1) date of contact, (2) company name and phone number, (3) person contacted, (4) type of work, (5) method of contact and (6) results. **Failure to provide this information upon request may result in a denial of benefits and possible overpayments and penalties.**

As your period of unemployment continues, you must expand your work search to include work at lower rates of pay.

¶3 Adams testified that he read and understood the *Claimant Guide* and indicated that he was aware of the requirement that "he should make at least two new job contacts each week with employers not previously contacted" and that upon request he was required "to provide a complete list of job contacts which include[d] company name, contact, position applied for, phone number or method of contact, and that these contacts must be [verifiable]." Each week that Adams applied for benefits, he was required to answer the following question: "Did you contact employers for work as you were instructed by the Department?" On each occasion, Adams responded, "Yes." Overall, Adams received unemployment benefits for seventy-one weeks, for a total of $33,467 in benefits.

¶4 In October 2010, the Department sent Adams a questionnaire to ensure that his unemployment benefits received for prior weeks had been properly paid. As part of the questionnaire, Adams was asked to attach his weekly job search contacts for the period from April 25, 2010, to October 2, 2010. In response, Adams wrote a letter explaining that "during the past couple of months, [he] only had one 'official' job-seeking contact." The letter continued,

I decided months ago that my best option was not to look for a job, but to make my own, and so I have been working tirelessly meeting with Venture Capitalists and other investors trying to raise money for a new enterprise that will not only employ me, but at least a dozen other Utahns too. In this letter, I will catalog all of the investors that I have met with, and the various conferences I've attended in order to expand my network. One of the reasons I was uncertain about sending this letter, however, is that I understand that as part of your audit, you're going to want to verify my work search contacts, but I feel very uneasy about the Department of Workforce Services contacting these investors. What I would ask is that if you need verification, please contact me, and I'll meet with you in person and we can discuss ways that you can verify that I made these contacts.

Adams then submitted a list of approximately thirty-five investors and several conferences he had attended. The list provided the names of the investors and their companies but did not provide contact information, the positions Adams applied for, the methods of contact, or the dates of contact.

¶5     On November 16, 2010, Adams met with a Department investigator assigned to explore concerns raised by Adams's letter. Adams told the investigator that he had made only four actual job applications since January 2010 but provided a list of six more investors he had contacted. Adams explained that his job search consisted primarily of meeting with investors in the hope that they would fund a start-up technology company and then offer him a position as the founder or chief operations officer. In particular, he indicated that since January 2010 his efforts were focused on getting funding for one particular new venture and that he expected to have the project funded in the next twelve months. The investigator's report indicates that when she asked Adams whether he had asked any of the investors for a job, Adams responded that "if he did that it would show [a] lack of confidence in [the new venture]."

¶6    On November 19, 2010, Adams received a "Notice of Issue," stating,

> A QUESTION EXISTS CONCERNING YOUR
> UNEMPLOYMENT BENEFITS
>
> If it is determined that you knowingly withheld information
> or willfully made a false statement to receive benefits, you
> will be assessed an overpayment, civil penalty, and be
> disqualified up to 49 weeks.
>
> **The potential overpayment and penalty are shown on the
> following page.**
>
> A response is required from you by 6:00 p.m. November 29,
> 2010.  If you fail to respond, a decision will be made based
> on the available information.

The following pages indicated that the weeks at issue were from May 2, 2009, to November 13, 2010—the entire period Adams filed for unemployment benefits.  Adams never responded to this notice.  On December 1, 2010, the Department issued a decision concluding that under Utah Code section 35A-4-403(1)(c), Adams had not been "available for work" because he had "not been seeking work as instructed."  *See* Utah Code Ann. § 35A-4-403(1)(c) (Supp. 2012).[1]  Thus, the Department concluded that Adams was not eligible throughout the period he had received unemployment benefits.

¶7    Adams appealed, and the Department scheduled a telephonic hearing for January 10, 2011, before an Administrative Law Judge.  The Department sent Adams notice of the hearing, which instructed him to "[p]rovide a copy of [his] complete list of job search contacts, beginning with the effective date of the disqualification/allowance under appeal, to the [ALJ] and other parties listed on th[e] notice prior to the hearing."  There was also a provision in the notice indicating that if he wished to introduce any additional documents he "MUST mail, fax, or hand-deliver the documents to the [ALJ]

---

[1]Because subsequent amendments to these statutes are not relevant to our analysis, we cite the current version of the Utah Code for the convenience of the reader.

and **all other parties at least three days before** the hearing." Adams did not provide a detailed list of employment contacts prior to the hearing.

¶8     Adams appeared on his own behalf at the hearing and indicated that he had prepared a more comprehensive list of contacts (the List). Although the ALJ would not allow Adams to introduce the List because it was not provided prior to the hearing as required, the ALJ told Adams, "[Y]ou can provide testimony about [the List] today during the hearing, . . . you can certainly do that." During the hearing, Adams testified that while his initial job search was "traditional," he later started focusing his efforts on networking with investors, venture capitalists, and members of the boards of start-up companies. He explained that he did so because his prior position was with an early stage technology company and meeting with these individuals was how he expected to find a similar job.

¶9     After the hearing, the ALJ issued two decisions. First, the ALJ determined that Adams was not available for full-time work during the entire period of unemployment because he did not satisfy the Department's requirements for making two new contacts with employers per week. The ALJ also noted that "[Adams] did not provide detailed records of specific contacts to the Department when requested in his initial meeting, nor did he provide specific contacts for the hearing." In the second decision, the ALJ concluded that Adams should be assessed a fraud penalty. Specifically, the ALJ held that Adams inaccurately reported that he had been searching for work when he had not, that he knew or should have known the Department's requirements for making job inquiries because it was explained in the *Claimant Guide*, and that Adams filed weekly claims based on inaccurate information. As a result, the ALJ found Adams was overpaid and required to repay $33,467 and was also liable for a civil fraud penalty of $33,467. The ALJ also determined that Adams would be ineligible for unemployment benefits for forty-nine weeks.

¶10     After this ruling, Adams obtained counsel and filed a motion to reopen the hearing to introduce the List for the ALJ's consideration. The Department treated this request as an appeal to the Board. The Board affirmed both of the ALJ's decisions. In doing so, the Board considered Adams's testimony regarding the contents of the List, despite the failure to enter the document into the record. Adams filed a motion for reconsideration, which the Board denied. He now petitions for our review of the Board's decisions.

ISSUES AND STANDARDS OF REVIEW

¶11    Adams first challenges the sufficiency of the evidence supporting the Board's determination that he was not available or was unable to work under Utah Code section 35A-4-403(1)(c). *See* Utah Code Ann. § 35A-4-403(1)(c) (Supp. 2012).  He next challenges the sufficiency of the evidence justifying the Board's finding of fraud and its imposition of a 100% penalty under Utah Code section 35A-4-405(5)(c). *See id.* § 35A-4-405(5)(c). Both of these claims present a mixed question of law and fact. *See Smith v. Department of Workforce Servs.*, 2010 UT App 382, ¶ 6, 245 P.3d 758 (reviewing the Board's findings of fact and conclusions of law when the sufficiency of the evidence supporting its conclusion was challenged).  "We will disturb the Board's findings of fact only if, when viewed in light of the record as a whole, they are not supported by substantial evidence." *Record v. Workforce Appeals Bd.*, 2011 UT App 340, ¶ 19, 263 P.3d 1210. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 8, 157 P.3d 334).  When reviewing "the Board's application of the law to its findings of fact, 'we will uphold the [Board's] decision so long as it is within the realm of reasonableness and rationality.'" *Id.* (alteration in original) (quoting *EAGALA, Inc.*, 2007 UT App 43, ¶ 9).

¶12    Next, Adams challenges the treatment of his motion to reopen the evidentiary hearing as an appeal to the Board.  He also argues that the Board abused its discretion when it refused to reopen the administrative hearing to permit Adams to submit additional evidence.  "We afford the Board some deference in the application of its administrative rules." *Id.* ¶ 18.

ANALYSIS

¶13    In considering Adams's claims, we distinguish between the Board's interpretation of the relevant statute (the Employment Security Act or the Act) and the rules promulgated thereunder, and the information available to Adams when he filed his claims for benefits. *See generally* Utah Code Ann. §§ 35A-4-101 to -508 (2011 & Supp. 2012).  Adams was privy to only the information provided in the *Claimant Guide*, but the prerequisites for the receipt of unemployment benefits are set forth in the Act and the regulations.  Thus, the resolution of whether a claimant was qualified to receive

benefits, may be different than whether the claimant knew or reasonably should have known of that ineligibility. Accordingly, we consider whether Adams was eligible for unemployment benefits separately from whether his acceptance of such benefits was fraudulent.

## I. Adams Was Not Entitled to Unemployment Benefits

¶14    Utah Code section 35a-4-403(1) provides that "an unemployed individual is eligible to receive benefits for any week if . . . (c) the individual is able to work and is available for work during each and every week for which the individual made a claim for benefits under this chapter." Utah Code Ann. § 35a-4-403(1) (Supp. 2012). The Department has promulgated regulations specifying that an individual is unemployed and eligible for benefits if he is "available for and actively seeking full-time suitable work for another employer" and meets other requirements not at issue here. *See* Utah Admin. Code R994-207-102(1)(c).[2] These regulations further explain that "[t]he efforts of a claimant to seek work should be distinguished from those directed towards obtaining work for himself as an individual and those directed toward obtaining work or customers for his corporation or business." *Id.* In turn, "[e]fforts to find work must be judged by the standards of the occupation and the community." *Id.* R994-403-113c(1). In order to be eligible for weekly benefits to the extent relevant here, the claimant

> (1) has the burden of proving that he or she is able, available, and actively seeking full-time work[;] (2) must report any information that might affect eligibility; (3) must provide any information requested by the Department which is required to establish eligibility; [and] (4) must keep a detailed record of the employers contacted, as well as other activities that are likely to result in employment for each week benefits are claimed.

*Id.* R994-403-114c. The regulations explain that to constitute an active work search a claimant must generally "contact a minimum of two employers not previously

---

[2]Because of changes to the Utah Administrative Code since the Board issued its decision, we cite the 2011 version of all regulations.

contacted unless . . . otherwise directed by the department." *See id.* R994-403-113c(2). These two weekly contacts "should be made with employers that hire people in the claimant's occupation." *Id.*

¶15    Here, Adams received unemployment benefits for seventy-one weeks. At two contacts per week, Adams should have made 142 contacts with employers and kept a detailed record of those activities. Adams admits that investors are not "traditional employer contact[s]" and that even considering the List information, he has not identified the requisite number of new contacts each week. Nevertheless, he claims that for those weeks for which he provided documentation, his "networking" contacts should satisfy the Department's rules. The Department disagrees, arguing that expanding one's personal network may be an invaluable aspect of an individual's job search but is categorically different from the job search required to be eligible for unemployment benefits.

¶16    We agree with the Department that, under the relevant rules, Adams's meetings with investors who might fund a business which at some future time might hire him, do not satisfy the requirement that he contact "two employers" per week. *See* Utah Admin. Code R994-403-113c(2) (providing that "contacts should be made with employers that hire people in the claimant's occupation or occupations for which the claimant has work experience or would otherwise be qualified and willing to accept employment"); *id.* R994-207-102(1)(c) (providing that the claimant should be seeking "work for another employer" in one's individual capacity, rather than primarily seeking to benefit one's company). However, this conclusion does not end our inquiry because while "generally" the claimant must contact two new employers per week, strict compliance is not always required. *See id.* R994-403-113c(2).

¶17    The failure to contact two new employers per week "creates a rebuttable presumption" that the claimant has not made an "active" effort to find work. *See id.* "The claimant may overcome this presumption by showing that he or she has pursued a job development plan likely to result in employment." *Id.* In determining whether the claimant has met the burden of overcoming that presumption, the Department considers the "claimant's job development activities for a specific week . . . in relation to the claimant's overall work search efforts and the length of the claimant's unemployment." *Id.*

¶18    Adams's failure to contact two employers, as opposed to investors, per week created a rebuttable presumption that he was not engaged in active efforts to become reemployed. However, Adams argued to the Department, the Board, and now to this court, that finding a job in his occupation as an officer of an early stage technology company is not amenable to the traditional method of submitting an application to existing companies. According to Adams, his goal of becoming reemployed in his traditional occupation would more likely be achieved by concentrating his efforts on persons likely to invest in, and select the management of, new technology companies. Consequently, Adams testified that he adopted that approach as his reemployment plan and focused on contacting investors rather than employers.

¶19    While the Board did not expressly refer to Adams's burden to rebut the presumption created by his failure to contact two employers each week, it carefully considered the evidence presented by Adams. In affirming the decision of the ALJ, the Board first concluded that Adams had failed to provide sufficient detail of his contacts and that most of the contacts listed were not individuals who might hire Adams. Next, the Board ruled that "even considering all the 'contacts' listed as credible, there were 26 weeks for which [Adams] provided no evidence of making a job contact, and 22 weeks for which [Adams] has provided evidence of only one job contact." Because Adams received benefits for seventy-one weeks, we can extrapolate that the Board identified twenty-three weeks in which Adams identified two or more investor contacts.

¶20    With respect to the weeks that he did not contact two or more investors, Adams does not challenge the Board's determination that he was not entitled to benefits. However, he contends that he was eligible for unemployment benefits during the weeks that he did so. We agree with the Board that Adams was not eligible for benefits for any of the weeks he received them because even if the contacts with investors could be considered employers, he did not provide sufficient documentation regarding those contacts as required by the *Claimant Guide* and Department rules.

¶21    Ultimately, it was Adams's burden to establish that his networking activities constituted an active job search and to provide detailed documentation of contacts when requested by the Department. *See generally* Utah Admin. Code R994-403-114c; *see also id.* R994-403-116e(1) ("Claimants and employers therefore have a continuing obligation to provide any and all information and verification which may affect eligibility."). Although Adams provided an explanation for his decision to contact

investors rather than employers, he admits that his "records of contacts are not of the quality requested by the Department." Based on our review of the record, we cannot conclude that Adams met his burden of providing the detail necessary to overcome the presumption that he did not engage in active efforts to find work. Accordingly, the Board's ruling that Adams was ineligible for unemployment benefits does not exceed the bounds of "reasonableness and rationality." *See Record v. Workforce Appeals Bd.*, 2011 UT App 340, ¶ 19, 263 P.3d 1210 (internal quotation marks omitted).

## II. The Evidence Is Sufficient to Support the Overpayment Penalty

¶22    Next, Adams contends that he acted in good faith in reporting his networking contacts and should therefore not be subject to a civil fraud penalty. A claimant is subject to fraud penalties for "willfully ma[king] a false statement or representation or knowingly fail[ing] to report a material fact to obtain any benefit." Utah Code Ann. § 35A-4-405(5)(a) (Supp. 2012); *see also id.* § 35A-4-405(5)(c) (providing that the claimant will be liable for paying a civil fraud penalty in the amount of the overpayment received "by direct reason of [the claimant's] fraud"). To establish fraud, the Department must prove materiality, knowledge, and willfulness. *See* Utah Admin. Code R994-406-401(1).

¶23    Here, Adams does not challenge the materiality of his representation that he contacted employers as instructed by the Department each week he received benefits. Instead, Adams contends that the Board was required to make a specific finding of an intent to defraud before it could conclude that he acted willfully. As support, Adams relies on the supreme court's decision in *Green v. Turner*, 2000 UT 54, 4 P.3d 789.

¶24    In *Green*, the Morgan County Commission reduced the county auditor's salary to offset the cost of hiring an independent accountant to perform some of the auditor's duties. *See id.* ¶ 3. The auditor filed a successful petition for a writ of mandamus that resulted in the reinstatement of her salary. *See id.* ¶ 1. In addition, the trial court imposed penalties against two of the commissioners under Utah Code section 17-5-207, which provides for the assessment of monetary penalties against a county commissioner who "'willfully, fraudulently, or corruptly attempts to perform an act unauthorized by law.'" *See Green*, 2000 UT 54, ¶ 12 (emphasis omitted) (quoting Utah Code Ann. § 17-5-207 (1999) (current version at *id.* § 17-53-227 (2009))). On appeal, the issue was the proof required to establish willfulness under the penalty statute. *See id.*

¶¶ 12-16. The supreme court explained that where a statute does not "expressly indicate whether the term 'willfully' includes an implied scienter component," the inclusion or exclusion of such a requirement "depends largely on the context and purposes of the statute or rule at issue." *Id.* ¶ 16. It then concluded that based on the context of the penalty statute, willfulness included a requirement that the commissioner "knew or should have known" that his conduct was not authorized by law. *See id.* ¶ 18.

¶25     Unlike the statute at issue in *Green*, the rules implementing the Employment Security Act expressly require that the Department prove knowledge. *See* Utah Admin. Code R994-406-401(1) (requiring the Department to prove materiality, knowledge, and willfulness to establish fraud). Thus, there is no need to undertake the analysis applied in *Green* to determine whether scienter is required to establish fraud under the Act.

¶26     The regulations establish that willfulness occurs "when a claimant files claims or other documents containing false statements, responses or deliberate omissions." Utah Admin. Code R994-406-401(1)(c). The Utah Supreme Court has held that the willfulness requirement under the Act is shown by a claim "which contain[s] false statements and fail[s] to set forth material facts required by statute." *Mineer v. Board of Review*, 572 P.2d 1364, 1366 (Utah 1977) (applying a prior version of the statute); *see also Frislie v. Department of Workforce Servs.*, 2011 UT App 114, ¶ 8, 256 P.3d 229 (per curiam) ("Willfulness was established by the filing of the claims containing false information."); *Smith v. Department of Workforce Servs.*, 2010 UT App 382, ¶ 22, 245 P.3d 758 (citing *Mineer*, 572 P.2d at 1366). "The filing of [a] claim evidences a purpose or willingness to present a false claim in order to obtain unlawful benefits and is in and of itself a manifestation of intent to defraud." *Martinez v. Industrial Comm'n*, 576 P.2d 1295, 1296 (Utah 1978). According to Adams, these decisions are distinguishable because they involve the claimant's failure to report known facts, such as wages earned or the ability to work. *See Frislie*, 2011 UT App 114, ¶ 8 (failing to report inability to work); *see also Mineer*, 572 P.2d at 1365 (failing to report work and earnings); *Baker v. Department of Emp't Sec.*, 564 P.2d 1126, 1127 (Utah 1977) (failing to report earnings and previously received unemployment compensation). In contrast, he argues that "there is no evidence that [he] knew when he filed his weekly claims that networking was not a job contact and, therefore, a false report." Because Adams does not dispute that he represented that he had contacted employers as instructed by the Department, his argument seems more appropriately characterized as a challenge to the knowledge component of fraud rather than willfulness.

¶27    We agree with Adams that every inaccuracy in a request for unemployment benefits is not, "per se, evidence of fraud." To hold otherwise would render the Department's burden to prove knowledge meaningless. Instead, knowledge is established where the claimant knew or should have known that he provided inaccurate information, or recklessly made representations knowing that he did not have sufficient information to do so. *See* Utah Admin. Code R994-406-401(1)(b).

¶28    Where facts are within the claimant's experience, he is charged with knowledge of them. For example, a claimant is presumed to know that he was in the hospital and therefore not available for work as required to receive unemployment benefits. *See Martinez*, 576 P.2d at 1296; *see also Christensen v. Board of Review*, 579 P.2d 335, 336 (Utah 1978) (injury and hospitalization during an unreported hunting trip). A claimant is also deemed to know the amount of and when he received his wages. *See Millett v. Industrial Comm'n*, 609 P.2d 946, 947 (Utah 1980) (failing to report wages); *see also Kearl v. Department of Emp't Sec.*, 676 P.2d 385, 386 (Utah 1983) (failing to report tips and self-employment); *Taylor v. Department of Emp't Sec.*, 647 P.2d 1, 2 (Utah 1982) (failing to report commissions), *superseded by statute on other grounds as stated in Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 67 (Utah Ct. App. 1989). Furthermore, claimants are expected to know the information provided to them by the Department, including the contents of the *Claimant Guide*. *See* Utah Admin. Code R994-406-401(b) ("A claimant has an obligation to read material provided by the Department and to ask a Department representative if he or she has a question about what information to report."); *Frislie*, 2011 UT App 114, ¶ 7 (noting that the claimant should have known what the Department required from reviewing the *Claimant Guide*). Adams admits that he received and read the *Claimant Guide*. Thus, the issue before us is whether the Board reasonably and rationally concluded that the contents of the *Claimant Guide* provide substantial evidence that Adams knew or should have known that his affirmative answer to the question, "Did you contact two new employers each week as you were instructed by the Department?," was false.

¶29    The Board concluded that "[t]he *Claimant Guide* is written in clear language" and that it instructed Adams "to contact 'employers not previously contacted' each week, not potential investors, wives of potential employers or friends." The Board further determined that the guide "clearly describes networking as an 'additional job-

development' activity, not as evidence of making job contacts." Adams disagrees, claiming that the *Claimant Guide* "does not restrict job contacts" to employers only and "in fact, the [guide] encourages 'networking.'" According to Adams, the investors that he contacted were "potential employers," and he had no reason to know that his weekly representations to the Department that he had contacted employers was not accurate.

¶30 However, Adams freely admitted during the Department's October 2010 investigation and at the hearing, that many of the contacts he made while receiving benefits were not potential employers but were investors who might provide funding to help him start a new company. Indeed, during the investigation, he stated that "during the past couple of months, [he] only had one 'official' job-seeking contact," and that "[he] decided months ago that [his] best option was not to look for a job, but to make [his] own." Additionally, when Adams provided a list of thirty-five investors to the investigator, he specifically indicated that he did not seek employment from those individuals themselves because that would make it seem as if he did not have confidence in the start-up company he was seeking to fund.

¶31 Furthermore, the ALJ asked if his contacts were with "employers or individuals in companies that would have had the ability to hire [him] and had an actual position open." Adams responded, "Well, some of them were prospective in that I knew that they were involved in companies and I was, you know, basically trying to put myself in position for executive openings in those companies." The ALJ further questioned, "But did they actually have an opening for that position?," to which Adams responded, "Well, in some cases I found out that there were, and in other cases there weren't." Additional testimony from Adams indicated that while his job search when he first started receiving unemployment benefits may have satisfied the Department's criteria, beginning in mid-2009 he realized this was not fruitful and "put[] more efforts into meeting with venture capitalist[s] and angel investors and other people who are in that world."

¶32 From these responses, there is substantial evidence to support the Board's determination that Adams knew that he was not contacting employers. Thus, we are also convinced that there is substantial evidence that Adams knew or should have known that he was providing inaccurate information when he stated that he "contact[ed] employers for work as [he was] instructed by the Department."

### III. The Board Acted Within Its Discretion in Refusing to Reopen the Evidence

¶33    Adams also argues that the Board erred in refusing to permit the ALJ to consider reopening the hearing under rules R994-508-117 and R994-508-118 of the Utah Administrative Code, and by treating his motion to do so as an appeal to the Board.  *See* Utah Admin. Code R994-508-117 to -118.  He first contends that subsection (5) of rule R994-508-117 allowed him to file a motion for rehearing.  That rule states, "The ALJ may reopen a hearing on his or her own motion if it appears necessary to take continuing jurisdiction or if the failure to reopen would be an affront to fairness."  Utah Admin. Code R994-508-117(5).  However, this subsection does not address the circumstances for reopening a hearing upon the motion of either of the parties.  *See id.*  And while the remaining portions of rule 994-508-117 do address that issue, the right to request a rehearing is limited to a party that failed to appear or participate at a hearing.  *See id.* R994-508-117.  Because Adams appeared and participated at the hearing, rule R994-508-117 is inapplicable.

¶34    Adams alternatively argues that he was entitled to a rehearing under rule R994-508-118 of the Utah Administrative Code.  That rule permits a rehearing under certain identified circumstances, even where the party was able to appear at the first hearing. *See id.* R994-508-118.  The Department asserts that Adams does not meet any of the criteria for rehearing provided by the rule, and Adams has not argued that he does. Even on review to this court, Adams has not indicated which subsection of rule R994-508-118 he contends would provide grounds for reopening the hearing.  Furthermore, Adams is not entitled to a rehearing simply to allow him to admit the List into the record.  As discussed, Adams was notified of his responsibility to present his evidence prior to the hearing before the ALJ and, despite his failure to present that evidence, he was allowed to testify to the contents of the List.  And the Board considered this testimony in making its decision.  Where Adams had notice of the deadline for exchanging exhibits, was allowed to present evidence of the List's contents, and the Board considered that testimony, we cannot conclude that the Department's decision to treat his motion to reopen the hearing as an appeal to the Board was an abuse of discretion.  *Cf. Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 70 (Utah Ct. App. 1989) (holding that the Board did not abuse its discretion in refusing to reopen the record to consider evidence where the party had "ample opportunity to present its case"); *Record*

*v. Workforce Appeals Bd.*, 2011 UT App 340, ¶ 25, 263 P.3d 1210 (concluding that the Board's refusal to supplement the record with photographic evidence taken after the evidentiary hearing "comport[ed] with elementary fairness" where "no extraordinary circumstances" existed).

¶35   In addition, Adams has not explained how the admission of this evidence would alter the outcome of the case.  Thus, even if the Board did err in treating his motion to reopen the evidence as an appeal, any error was harmless.[3]  *See Smith v. Department of Workforce Servs.*, 2010 UT App 382, ¶ 23, 245 P.3d 758 ("[E]ven resolving any doubt in [claimant's] favor, she has not demonstrated a reasonable likelihood that the error affected the outcome of the hearing." (internal quotation marks omitted)).

CONCLUSION

¶36   The Board did not exceed its discretion in determining that Adams was unavailable for work during the period he received unemployment benefits.  Furthermore, the Board's imposition of fraud penalties is supported by substantial

---

[3]Adams also argues that the hearing should be reopened because he proceeded pro se at the hearing and was confused as to the process.  Although parties proceeding without counsel are entitled to "due process of law, including the opportunity for a fair hearing, . . . the hearing officer is not required to assume the duties of counsel for that party during the administrative hearing."  *Wright v. Workforce Appeals Bd.*, 2011 UT App 137, ¶ 2, 254 P.3d 767.  It is the responsibility of the claimant "to be diligent in reading the instructions contained in the hearing notices."  *See Naylor v. Department of Workforce Servs.*, 2010 UT App 395U, para. 4 (per curiam) (citing Utah Admin. Code R994-406-401(1)(b)).  The Department instructed Adams to "[p]rovide a copy of [his] complete list of job search contacts" for the entire period of benefits and notified him that all evidence must be exchanged at least three days before the hearing.  Under these circumstances, we cannot conclude that Adams was denied due process.  *See Chen v. Stewart*, 2004 UT 82, ¶ 68, 100 P.3d 1177 ("Although the exact requirements of due process may vary from situation to situation, the minimum requirements of due process include adequate notice and an opportunity to be heard in a meaningful manner.").

evidence. Finally, the Board did not err in treating Adams's request to reopen the evidence as an appeal, and any presumed error was harmless. Accordingly, we do not disturb the Board's decisions.

_____
Carolyn B. McHugh,
Presiding Judge

-----

¶37    WE CONCUR:

_____
James Z. Davis, Judge

_____
Michele M. Christiansen, Judge